UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | Civil Action No. 05-443 (GMS) |
| | ) | |
| STATE OF DELAWARE, | ) | |
| | ) | |
| Plaintiff/Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FORMOSA PLASTICS CORPORATION, | ) | |
| DELAWARE, | ) | |
| Defendant. | ) | |
| | ) | |

**THE UNITED STATES' MOTION TO ENTER CONSENT DECREE
AND MEMORANDUM IN SUPPORT THEREOF**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　　　　and<br><br>STATE OF DELAWARE,<br><br>　　　　Plaintiff/Intervenor,<br><br>　　　　　v.<br><br>FORMOSA PLASTICS CORPORATION,<br>DELAWARE,<br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)　Civil Action No. 05-443 (GMS)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## THE UNITED STATES' MOTION TO ENTER CONSENT DECREE

The United States, through undersigned counsel, hereby moves the Court to enter the

Consent Decree previously filed in this case. The State of Delaware and Formosa consent to this

motion. In support of this motion, the United States submits the accompanying memorandum of

law.

Dated:   8/31/05

Respectfully submitted,


KELLY A. JOHNSON
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

*C. Connolly (by RC)*

COLM F. CONNOLLY
United States Attorney
District of Delaware

RUDOLPH CONTRERAS
Assistant United States Attorney
Chief, Civil Division
District of Delaware
Nemours Building
P.O. Box 2041
Wilmington, DE   19899-2046
(302) 573- 6277 ext. 154

Counsel for the United States

- 2 -

## Table of Contents

**PAGE**

TABLE OF CONTENTS ...................................................... i

TABLE OF AUTHORITIES .................................................. ii

NATURE AND STAGE OF PROCEEDINGS ...................................... v

SUMMARY OF THE ARGUMENT.............................................. vi

STATEMENT OF FACTS/BACKGROUND........................................ 2

STANDARD OF REVIEW .................................................. 19

ARGUMENT .......................................................... 19

    The Consent Decree is Fair, Reasonable, and Consistent with the Public Interest  21

    The Public Comment Does Not Serve as a Basis to Withhold Entry of the Consent
    Decree ......................................................... 22

CONCLUSION......................................................... 24

## Table of Authorities

### Federal Cases

*United States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1035 (D. Mass. 1989) . . . . . . . - 19 -

*United States v. SEPTA*, 235 F.3d 817, 822 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . - 20 -

*Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) . . . . . . . . . . - 20 -

*In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003) . . . . . . . . . . . . . - 21 -

*United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409,1424 (6th Cir. 1991) . . . . . . . . - 20 -

*United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . - 23 -

*United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) . . . . . . . . . . - 20 -

*United States v. Hooker Chem. and Plastics Corp.*, 776 F.2d 410, 411 (2d Cir. 1985) . . . . - 19 -

*United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348, 351 (6th Cir. 1986) . . . . . . . - 19 -

*United States v. Nat'l R.R. Passenger Corp.*, No. CIV. A. 86-1094, 1099 WL 199659, at *7 (E.D. Pa. April 6, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 20 -

### Federal Statutes

33 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

33 U.S. C. § 1251 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

33 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

33 U.S.C. § 1342. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

33 U.S.C. §§ 1321 and 1361. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 8 -

42 U.S. C. § 6901 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

42 U.S. C. § 9601 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

42 U.S.C. § 11001 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

42 U.S.C. § 6926 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 6 -

42 U.S.C. § 6928(a) and (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 7 -

42 U.S.C. § 7401 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

42 U.S.C. § 7412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

42 U.S.C. § 7412. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -

42 U.S.C. §§ 6901 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 6 -

42 U.S.C. §§ 7661 to 7661(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -

**Federal Regulations**

28 C.F.R. § 50.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-, 18 -

40 C.F.R. Part 60, Appendix A-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -, - 15 -

40 C.F.R. 61.70(c)(4)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

40 C.F.R. Part 61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

40 C.F.R. Part 61, Subpart F, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

40 C.F.R. § 61.64(f)(1)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

40 C.F.R. § 61.65(b)(8)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -

40 C.F.R. § 61.70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -

40 C.F.R. Part 63, Subpart UU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -

40 C.F.R. § 63.1039(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 14 -

40 C.F.R. § 70.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -

40 C.F.R. § 70.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -

40 C.F.R. Part 70, Appendix A. ............................................. - 5 -

40 C.F.R. Part 82 ....................................................... -5-, - 12 -

40 C.F.R. Part 110 ........................................................ - 9 -

40 C.F.R. Part 112 ........................................................ - 8 -

40 C.F.R. Parts 260 through 272 ........................................... - 6 -

40 C.F.R. Subpart F (§§ 61.60 to 61.71.) .................................... - 5 -

## Other Federal Authorities

38 Fed. Reg. 34164 ....................................................... - 8 -

53 Fed. Reg. 23837 (June 8, 1994) ......................................... - 6 -

60 Fed. Reg. 42871 (July 12, 2000) ........................................ - 6 -

61 Fed. Reg. 42345 (October 7, 1996) ...................................... - 6 -

63 Fed. Reg. 44152 (August 18, 1998) ..................................... - 6 -

70 Fed. Reg. 39335 (July 7, 2005) ......................................... - 18 -

## State Regulations

DRGHW Parts 264 and 265 ................................................ - 7 -

DRGHW § 262.11 ........................................................ - 7 -

DRGHW § 265.1087 ..................................................... - 7 -

DRGHW § 268.40 ....................................................... - 7 -

## Nature & Stage of Proceedings

On June 28, 2005, the United States lodged a Consent Decree with the Court that, if entered, will entirely resolve this matter. The Consent Decree recites that it will be "lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with 28 C.F.R. § 50.7." Consent Decree at ¶ 125. Pursuant to this Paragraph, the United States provided notice of the Decree and indicated that it would receive public comment for a period of 30 days. Only one comment was received during that period. Because the public comment received does not alter the United States' conclusion that the Consent Decree is fair, reasonable and in the public interest, the United States now moves this Court to enter the Consent Decree.

## Summary of Argument

The Consent Decree is fair, reasonable and in the public interest because:

- it is the product of intense negotiations between the parties over several months;

- it contains provisions returning Formosa to statutory and regulatory compliance, as well as measures to ensure consistent compliance into the future;

- it contains measures that go beyond legal compliance, obtaining Formosa's agreement to reduce vinyl chloride emissions by 18 tons in the first year, and up to an additional 10 tons per year within the next three years below what the law requires;

- it obtains a penalty from Formosa that is adequate to punish Formosa for past violations and to deter it from committing future violations.; and

- the single, very brief, conclusory comment received in response to the published request for public comment does not provide any persuasive reasons to alter this conclusion.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>  Plaintiff, )<br><br>  and )<br><br> STATE OF DELAWARE, )<br><br>  Plaintiff/Intervenor, )<br><br>  v. )<br><br> FORMOSA PLASTICS CORPORATION, )<br> DELAWARE, )<br>  Defendant. ) | Civil Action No. 05-443 (GMS) |

## THE UNITED STATES' MEMORANDUM IN SUPPORT OF
## MOTION TO ENTER CONSENT DECREE

On June 28, 2005, the United States lodged a Consent Decree with the Court that, if entered, will entirely resolve this matter. The Consent Decree recites that it will be "lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with 28 C.F.R. § 50.7." Consent Decree at ¶ 125. Pursuant to this Paragraph, the United States provided notice of the Decree and indicated that it would receive public comment for a period of 30 days. Only one comment was received during that period. Because the public comment received does not alter the United States' conclusion that the Consent Decree is fair, reasonable and in the public interest, the United States now moves this Court to enter the Consent Decree. The State of Delaware and Formosa consent to this motion.

I.    **BACKGROUND**

A. **Formosa**

Formosa Plastics Corporation, Delaware ("Formosa") owns and operates a poly vinyl chloride ("PVC resin") manufacturing plant located at 780 School House Road, Delaware City, Delaware.  PVC resin is a plastic material used in many applications from flexible sheeting to rigid water pipes.  The facility uses a batch dispersion process in which vinyl chloride monomer ("VCM"), a carcinogenic gas, and other ingredients are combined in pressure vessels called reactors.

Polymerization takes place in those reactors, a process in which the molecules of VCM are linked together to form long chains.  These polymer chains constitute the plastic PVC resin which Formosa sells as its product.

After the reaction is complete, the PVC resin is dried and then bagged for sale.  In the drying process, much of the vinyl chloride monomer that has not been converted into a polymer chain or recovered for reuse will evaporate and escape to the atmosphere.  The escape of this un-reacted residual vinyl chloride monomer ("RVCM") is the largest source of vinyl chloride emitted from the plant.

Vinyl chloride is a toxic chemical regulated under the Clean Air Act which is widely used in the manufacturing of polyvinyl chloride (PVC).  Exposure to vinyl chloride emissions has been linked to adverse human health effects including liver cancer, other liver diseases, and neurological disorder.  Vinyl chloride is also considered to be carcinogenic in both humans and animals.

Formosa's manufacturing process also creates several streams of liquid and sludge

- 2 -

wastes. Wastewater from the facility is treated in a system that includes two large aeration basins. Off-spec "product" and other scrap PVC solids have historically been accumulated at various locations throughout the facility.

### B. The Government's Inspection of Formosa

During the summer of 2003, a team of inspectors and engineers from EPA Region III and the National Enforcement Investigation Center, along with representatives of the State of Delaware, conducted a three-week long inspection of Formosa's facility. This comprehensive inspection looked at all media (*e.g.*, air, water, solid waste) and looked closely, not only at vinyl chloride emissions, but also at storm water runoff, on-site laboratory procedures, spill containment plans, permit compliance, accidental releases, leak detection programs, emissions of other compounds, etc. During this inspection, the team discovered evidence of a number of violations of the environmental statutes and regulations.

### C. The Government's Response

As a result of the above-referenced findings, the Federal and State agencies contacted Formosa and entered into negotiations concerning the violations identified during the multi-media inspection. These negotiations lasted several months and included representatives from all of the agencies responsible for the environment in Delaware. The United States Department of Justice provided a senior career attorney from its Environment and Natural Resources Division. Additionally, the Civil Chief from the United States Attorney's Office was involved in every aspect of the negotiations. EPA also provided attorneys but, more importantly, provided a large team with technical expertise in all aspects of this multimedia case. The State of Delaware also provided attorneys from its Department of Justice and more technical expertise from its

- 3 -

Department of Natural Resources and Environmental Control ("DNREC"). Because they were

very familiar with Formosa' facility, the DNREC technical staff provided site-specific expertise.

Together, this large team of attorneys and technical experts provided its best efforts to assure that

the best deal possible was worked out to protect Delaware's environment.

### D.  The Complaint and Consent Decree

As a result of the above-referenced successful negotiations, on June 28, 2005, the United

States filed a Complaint and lodged a Consent Decree in this action. Nearly simultaneously, the

State of Delaware filed a Complaint in Intervention.

The United States' Complaint alleged violations by Formosa of: the Clean Air Act

("CAA"), 42 U.S.C. § 7401 *et seq.*; the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*; the

Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*; the

Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42

U.S.C. § 9601 *et seq.*; and, the Emergency Planning and Community Right-to-Know Act

("EPCRA"), 42 U.S.C. § 11001 *et seq.* The State of Delaware's Complaint in Intervention made

similar allegations against Formosa. The following is a summary of the allegations that the

parties seek to resolve through the entry of the Consent Decree.

### 1.    The Clean Air Act

Section 112 of the CAA, 42 U.S.C. § 7412, requires the Administrator of EPA to publish

a list of air pollutants determined to be hazardous and to promulgate regulations establishing

emission standards or, where necessary, design, equipment, work practice, or operational

standards for each listed hazardous air pollutant ("HAP"). These regulations are known as the

National Emission Standards for Hazardous Air Pollutants ("NESHAP"). EPA has designated

"vinyl chloride" as a HAP under the authority of Section 112b of the CAA, 42 U.S.C. § 7412. The emission standards for vinyl chloride are found at 40 C.F.R. Subpart F (§§ 61.60 to 61.71.)(the Vinyl Chloride NESHAP).

Under subchapter V of the Clean Air Act, 42 U.S.C. §§ 7661 to 7661(f), owners and operators of air pollutant emissions "major sources," as that term is defined under 40 C.F.R. § 70.2, are subject to the Federal and/or an approved State air permitting program. Delaware's Part 70 program was approved by EPA on November 19, 2001. 40 C.F.R. Part 70, Appendix A. Pursuant to 40 C.F.R. § 70.1(b), all sources subject to the Delaware Part 70 program shall have a permit to operate that assures compliance by the source with all "applicable requirements" as that term is defined under 40 C.F.R. § 70.2. In accordance with the requirements of 40 C.F.R. Part 70, and the Delaware Regulations Governing the Control of Air Pollution no. 30,  Respondent was issued a Title V Permit No. AQM-00300027  by the State of Delaware on December 31, 2001.  Changes to Formosa's Title V Permit as a result of this Agreement will live on and be enforceable beyond the life of the Consent Decree.

During a multimedia inspection of the Formosa facility, EPA and DNREC inspectors' observations indicated violations of the CAA at the Formosa facility.  The CAA violations EPA alleges are: violations of the test method required under the Vinyl NESHAP; violations of Title V and Vinyl NESHAP emission standards; failure to prevent a release of vinyl chloride into the atmosphere; violations of the leak detection and elimination requirements of the Vinyl NESHAP; and, violations of the Ozone Depleting Substance regulations, 40 C.F.R. Part 82.

The violations included sizeable vinyl chloride releases (*e.g.*, a 600 lb. release in December 2003; a 1198 lb. release in June 2004).  But the violations also included issues

concerning: at what point in the process Formosa measured the RVCM; the type of sample bottle

Formosa used in its lab testing and its refrigeration of such samples; the type of leak detection

apparatus Formosa utilized and the calibration of such equipment; and, the failure to maintain

records concerning the servicing of Formosa's refrigeration equipment.

## 2.    Resource Conservation and Recovery Act:

RCRA establishes a comprehensive program to be administered by the Administrator of

EPA for regulating the generation, transportation, treatment, storage, and disposal of hazardous

waste. 42 U.S.C. §§ 6901 et seq. Pursuant to its authority under RCRA, EPA has promulgated

regulations at 40 C.F.R. Parts 260 through 272 applicable to hazardous waste generators,

transporters, and treatment, storage and disposal facilities. These regulations generally prohibit

treatment, storage and disposal of hazardous waste without a permit or "interim status." They

prohibit land disposal of certain hazardous wastes, and provide detailed requirements to govern

the activities of those who are lawfully permitted to store, treat and dispose of hazardous waste.

Under Section 3006 of RCRA, 42 U.S.C. § 6926, state hazardous waste programs may be

authorized by EPA to operate in lieu of the federal hazardous waste program. The requirements

of the federal RCRA regulations are not applicable to persons who generate, treat, store, transport

or dispose of hazardous wastes in a state which has received authorization to administer a state

hazardous waste program.

The Delaware Regulations Governing Hazardous Waste ("DRGHW") are authorized by

EPA pursuant to RCRA Section 3006, 42 U.S.C. § 6926, see 53 Fed. Reg. 23837 (June 8, 1994),

61 Fed. Reg. 42345 (October 7, 1996), 63 Fed. Reg. 44152 (August 18, 1998), and 60 Fed. Reg.

42871 (July 12, 2000). Certain provisions of Delaware's hazardous waste management program,

through the authorization referenced in the immediately preceding sentence, have become requirements of Subtitle C of RCRA and are, accordingly, enforceable by EPA pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g).

During the multimedia inspection of the Formosa facility, as well as subsequent sampling at the Formosa facility, EPA and DNREC inspectors' observations indicated violations of RCRA at the Formosa facility. The specific RCRA violations EPA alleges are: failure to make waste determinations as required by DRGHW § 262.11 for numerous waste streams; placing characteristic hazardous waste from reactor clean outs in basket like containers not meeting applicable requirements (DRGHW § 265.1087); placing hazardous waste that did not meet applicable treatment standards into a land disposal unit (the aeration basins) (DRGHW § 268.40); and, storing and/or treating hazardous waste in surface impoundments without a permit or interim status to do so (DRGHW Parts 264 and 265).

With respect to the violations concerning the failure to perform characterizations, the waste streams at issue involved, not only PVC solids from various points in the process, but also more common refuse such as aerosol cans, fluorescent light bulbs, and unused welding rods. With respect to the violations concerning the aeration basins, it is important to understand that these claims were susceptible to some litigation risk. In order for vinyl chloride to be considered hazardous waste going into the aeration basins, it has to be higher than a certain regulatory threshold amount ( 0.2. mg/L). EPA testing in July 2004 indicated vinyl chloride was present in the wastewater entering the aeration basin at levels of 0.164-.172 mg/L, slightly below the regulatory limit. However, EPA concluded that, based on its process knowledge of Formosa's operations, at times, Formosa would violate the regulatory standard. Although this is a strong

- 7 -

theory, because EPA never obtained a sample violative of the standard, the argument suffers from some litigation risk.

### 3. **Clean Water Act**

Section 301(a) of the CWA, 33 U.S.C. § 1311(a), makes it unlawful for any person to discharge any pollutant from a point source to the waters of the United States except with authorization and in compliance with effluent limitations and conditions established pursuant to the CWA, including Section 402 of the CWA, 33 U.S.C. § 1342. Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator may issue to any person or group a National Pollutant Discharge Elimination System (NPDES) permit which authorizes the discharge of pollutants to waters of the United States, on condition that such discharges will meet all applicable requirements of the CWA, its regulations, the relevant permit, and that the permittee comply with such other applicable requirements and conditions. States may be delegated the authority by EPA to issue such permits. Delaware was authorized by EPA to issue NPDES permits on May 4, 1983. On September 12, 2002, pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, and Chapter 7 Del. C. 6003, DNREC issued NPDES Permit number DE0000612 (hereinafter Permit) allowing Formosa to discharge from its Facility to the Delaware River (Outfall 001), Red Lion Creek (Outfall 002) and Dragon Run (Outfalls 003 and 004), in accordance with the effluent limitations, monitoring requirements and other conditions set forth in the Permit.

EPA originally promulgated the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112, on December 11, 1973, (38 Fed. Reg. 34164), under the authority of Sections 311 and 501 of the CWA, 33 U.S.C. §§ 1321 and 1361. Part 112 applies to owners or operators of non-

transportation-related onshore and offshore facilities engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using, or consuming oil or oil products and which, due to their location, could reasonably be expected to discharge oil in harmful quantities, as defined in 40 C.F.R. Part 110, into or upon navigable waters of the United States or adjoining shorelines (collectively, Part 112 Facilities). Section 112.3 requires owners and operators of these Part 112 Facilities to prepare and implement a Spill Prevention, Control and Countermeasure Plan, in accordance with Section 112.7.

During the multimedia inspection of the Formosa facility, EPA and DNREC inspectors' observations indicated violations of the CWA at the Formosa facility. The CWA violations EPA alleges are: Formosa failed to minimize storm water runoff from its facility, in violation of its NPDES permit; Formosa violated the effluent limits of its NPDES permit (phenol); Formosa failed to follow the proper sampling and testing procedures for Total Suspended Solids (failure to adequately shake samples before testing); and, Formosa failed to have an adequate SPCC plan in that it failed to make adequate provision for secondary containment for several tanks at the facility (two 500 gallon tanks had no containment while a few larger tanks had containment that could not hold the entire capacity of the tank).

The stormwater violations were observed during a significant rain event during the multimedia inspection. Formosa has claimed, and the government does not dispute, that the stormwater problems resulted from clogged drainage that was remedied shortly after the inspection. The phenol permit violation was based on an annual sample and apparently a one-time exceedance that has not re-occurred. The sampling violation was remedied shortly after the inspection. And the spill plan violations, which will be addressed in a new plan to be devised as

- 9 -

part of the Consent Decree, resulted in no releases to the environment.

### 4. CERCLA/EPCRA

Section § 103(a) requires the person in charge of a facility or vessel, from which a CERCLA hazardous substance has been released in an amount that meets or exceeds its reportable quantity, to immediately notify the National Response Center as soon as he or she has knowledge of the release. Likewise under EPCRA, Section § 304(a) requires the owner or operator to notify immediately the appropriate governmental entities for any release that requires CERCLA 103(a) notification and for certain other releases of Extremely Hazardous Substances ("EHSs") designated under Section 302 of EPCRA. EPCRA § 304(b) provides that the notification must be given to the State Emergency Response Commission ("SERC") for all states likely to be affected by the release and to the community emergency coordinators for the Local Emergency Planing Committee ("LEPC") for all areas likely to be affected by the release, and specifies the contents of the notice. Moreover, EPCRA § 304(c) requires a written follow-up report to the appropriate governmental entities for any release that requires notification under 304(a). EPCRA § 313 requires the owner or operator of a facility to submit an annual report to EPA, and the state chemical release forms documenting the amount of each listed toxic chemical manufactured, processed or otherwise used over the threshold amount at the facility each year.

During the multimedia inspection of the Formosa facility, EPA and DNREC inspectors' observations indicated violations of CERCLA and EPCRA notification and reporting requirements. Specifically, EPA alleges that Formosa failed to comply with the CERCLA and EPCRA emergency reporting requirements on several occasions, as well as failed to submit accurate reports as required under EPCRA § 313 (reporting of vinyl chloride and vinyl acetate on

- 10 -

EPA Form R).

The reporting/notification allegations concern Formosa's delay in providing verbal notification of releases to Federal, State and local emergency response centers and also delay in providing post-release written reports. With respect to the delays in verbal notices, it is important to note that none of the releases required the response of emergency personnel. With respect to Form R reporting violations, it is also important to note that these violations involve historical reporting requirements and do not involve permit exceedances.

## II.    **THE CONSENT DECREE**

As set forth above, the Consent Decree, lodged simultaneously with the Complaint, represents the culmination of months of effort to resolve the allegations in the United States' Complaint. Embodying a settlement between the United States, the State of Delaware, and Formosa, the Consent Decree resolves all the matters pending in this case. The Consent Decree consists of four parts: injunctive relief requiring corrective action; a Supplemental Environmental Project ("SEP"); an Incentive Program; and, a significant penalty. The Consent Decree directly addresses the alleged violations by requiring a return to compliance and the implementation of corrective measures to assure continued compliance. Additionally, a significant penalty is imposed in order to punish past violations and deter future ones. Moreover, and perhaps most importantly, this Consent Decree is noteworthy because it also reflects Formosa's agreement to implement measures beyond what the current laws and regulations require, through the implementation of injunctive relief, the SEP and the Incentive Program, resulting in significant reductions of vinyl chloride emissions to the environment.

A. **Injunctive Relief - Statutory and Regulatory Compliance**

The Consent Decree requires Formosa to comply with the following measures to achieve statutory and regulatory compliance. Failure to comply with these requirements exposes Formosa to stipulated penalties (Section IX), contempt, as well as a potential enforcement action (Consent Decree at ¶ 110). The provisions of the Consent Decree require Formosa to:

(1) comply with the vinyl chloride emission standard of 2.02g of vinyl chloride monomer per Kg of PVC on a dry solids basis set forth in 40 C.F.R. § 61.64(f)(1)(i)(Consent Decree at ¶ 11);

(2) comply with the daily average residual vinyl chloride monomer (RVCM) standards and limits set forth in the Title V Permit (Consent Decree at ¶ 12);

(3) comply with the 40 C.F.R. § 61.65(b)(8)(i) requirement to develop a reliable and accurate vinyl chloride monitoring system program and submit a description of that program to EPA for approval (Consent Decree at ¶ 15 and Appendix ["App."] C);

(4) operate all cooling equipment in accordance with the manufacturers' specifications (Appendix D) and recommendations and comply with the record keeping and reporting requirements of 40 C.F.R. Part 82 (Consent Decree at ¶ 17);

(5) submit to the State an application with supporting information for a modification of the vinyl acetate emission limit in the Facility's Title V permit (Consent Decree at ¶ 18);

(6) comply with the reporting requirements of 40 C.F.R. 61.70(c)(4)(iv); (6) 40 C.F.R. Part 61, Subpart F, and the Title V Permit (Consent Decree at ¶ 19);

(7) comply with EPA Test Method 107 as set forth in 40 C.F.R. Part 61 (Consent Decree at ¶ 20 and App. B);

(8) develop and implement an adequate Spill Prevention and Control Plan (Consent Decree at ¶ 28 and App. L);

(9) comply with the requirements of NPDES Permit DE 0000612 pertaining to phenol, storm water and sampling and analysis with respect to total suspended solids ("TSS")(Consent Decree at ¶ 29 and App. M).

These provisions not only require Formosa to comply with pre-existing environmental statutes and regulations, but can be enforced by way of the stipulated penalties imposed by the Consent Decree. Thus, although Formosa is already legally required to comply with these statutes and regulations, the provisions of the Consent Decree streamline the enforcement process and, because the applicable penalties have already been stipulated, eliminate the need to negotiate or litigate the amount of any penalty imposed as a result of a failure to comply with the applicable environmental statute or regulation.

**B. Injunctive Relief - Measures Beyond Statutory and Regulatory Compliance**

While many of the measures listed below are designed to ensure consistent compliance in response to the alleged violations, other measures require Formosa to go beyond compliance with existing statutes and regulations, thus, resulting in vinyl chloride and other pollutant emission reductions. Under the terms of the Consent Decree, Formosa must carry out these measures or be liable for stipulated penalties and/or contempt (Consent Decree, Section XI & ¶ 110). The programs Formosa has designed to implement these measures have already been reviewed by EPA and the State of Delaware and are attached as appendices to the Consent Decree. These provisions of the Consent decree require Formosa to:

(1) immediately reduce vinyl chloride emissions on a weighted 12 month rolling average

- 13 -

to 750 ppm vinyl chloride on a dry solids basis (Consent Decree at ¶ 40 ). **Under Formosa's Title V permit, it may emit 1000 ppm. Based on current capacity, this reduction represents an 18 ton per year reduction in the vinyl chloride Formosa is legally permitted to emit. Because of vinyl chloride's health dangers set forth above, this is a significant reduction beyond what the law requires and beyond what the government would be able to obtain even if it fully prevailed in this litigation;**

(2) carry out a program of enhanced operator training designed to prevent unauthorized or improper releases of vinyl chloride and to reduce the RVCM remaining in PVC after stripping (Consent Decree at ¶ 13 & App. A);

(3) conduct a layer of protection analysis ("LOPA") based upon a 2006 process hazard analysis, and implement the recommendations generated by the LOPA (Consent Decree at ¶ 14 & App. B);

(4) comply with 40 C.F.R. Part 63, Subpart UU (National Emission Standards for Equipment Leaks-Control Level 2 Standards) and submit 40 C.F.R. Part 63 Subpart UU Periodic Reports as required in 40 C.F.R. § 63.1039(b) as part of the Vinyl Chloride NESHAP quarterly reporting requirements of 40 C.F.R. § 61.70; ensure that no leak detection instrument is used without being calibrated in compliance with 40 C.F.R. Part 63, Subpart UU, and EPA Method 21 of 40 C.F.R. Part 60, Appendix A-7; and, modify the Facility's CAA Title V permit to incorporate the requirement to comply with Subpart UU. This measure will result in increased record-keeping, lower leak detection limits and more stringent monitoring.(Consent Decree at ¶ 15(c)). **The requirement that Formosa comply with Subpart UU goes beyond the Vinyl NESHAP leak detection requirements;**

- 14 -

(5) integrate responsibility for compliance with 40 C.F.R. Part 82 between the Facility Maintenance Manager and the Environmental Manager such that the Facility Environmental Manager is able to assure compliance with 40 C.F.R. Part 82 (Consent Decree at ¶ 17);

(6) implement a lab technician training program (Consent Decree, App. G) and conduct a lab audit to assure continuous compliance with Test Method 107 (Consent Decree at ¶¶ 20 & 31);

(7) implement a comprehensive Waste Analysis and Management Plan (Consent Decree at ¶ 21 & App. E);

(8) purchase and install only low mercury level flourescent light bulbs (Consent Decree at ¶ 22). **This measure will result in a reduction of mercury released to the environment;**

(9) implement a PVC Solids Management Plan (Consent Decree at ¶ 23 & Appendix O);

(10) strip all in-process wastewater to a limit of 3 ppm (or below) vinyl chloride prior to both exposure to the atmosphere and discharge into the wastewater treatment system, and take all steps necessary to apply for and effect an modification of the Facility's Title V permit to incorporate the 3 ppm stripping requirement (Consent Decree at ¶ 24). **The Vinyl NESHAP requires Formosa to strip to 10 ppm. Accordingly, this provision provides for a 70% reduction over that required by law and is designed to ensure that no hazardous waste enters the aeration basins;**

(11) implement a hazardous materials contingency plan (Consent Decree at ¶ 26 & App. F);

(12) remove all PVC solids from the aeration basins and make any necessary repairs to the liners of the aeration basins within twelve months of entry of the Consent Decree (Consent

Decree at ¶ 25);

(13) use the methodology attached as Appendix H for determining and reporting the

Toxic Release Inventory data for vinyl chloride and vinyl acetate released into the environment,

transferred offsite, and treated onsite pursuant to Section 313 of EPCRA (Consent Decree at ¶ 30

& App. H);

(14) implement the emergency notification program (Consent Decree at ¶ 32 & App. I).

## C. **Supplemental Environmental Project**[1]

Formosa will implement a SEP at the cost of $842, 847 (Consent Decree at App. J). The

SEP is made as part of the agreement as partial mitigation of what would otherwise be a higher

cash penalty. As such, the utilization of a SEP in the agreement, which requires a significant

cash outlay from Formosa, ensures that a significant amount of money is spent locally to improve

the environment in the area in which the violations occurred.

The SEP is designed to automate reactor charging, venting and dropping of PVC resin

during the manufacturing process at the Formosa facility. To accomplish this, it will be

necessary for Formosa to install new valves, upgrade existing valves, install instrumentation, and

install computer hardware and software to automate the valves in both of its plants at the facility.

The sequence valve automation project is estimated to reduce vinyl chloride emissions by a

minimum of 100 pounds per year after initial installation. However, additional vinyl chloride

emissions reductions may be obtained as the automation results in more consistent reactor

---

[1]     "SEPs are environmentally beneficial projects that a violator is not otherwise
legally required to perform but agrees to undertake in settlement of an enforcement action."
Memorandum from John Peter Suarez to Assistant Administrators et al. (June 11, 2003). For
more information on SEPs, *see* the documents posted on EPA's website at:
http://cfpub.epa.gov/compliance/resources/policies/civil/seps/

charging, as well as fewer wasted batches, operator errors and releases.  Reductions of operator errors are essential in that they have been a source of accidental releases in the past.

### D. Incentive Program

Formosa has agreed upon a goal for vinyl chloride emission reductions, three years from the entry of the Consent Decree, of 550 ppm vinyl chloride on a weighted 12 month rolling average on a dry solids basis (Consent Decree at ¶¶ 39-41).  In addition to the immediate 18 ton per year permitted reduction set forth above, a potential of up to ten additional tons of vinyl chloride emissions could be eliminated at the end of three years through application of the Incentive Program based on current capacity.

Because of the health dangers of vinyl chloride set forth above, the immediate reduction and the Incentive Program are the cornerstones of the Consent Decree.  As set forth above, under Formosa's Title V permit, it may emit 1000 ppm of vinyl chloride.  The Consent Decree requires that Formosa immediately reduce its vinyl chloride emissions on a weighted 12 month rolling average to 750 ppm vinyl chloride on a dry solids basis, well below what it is legally permitted to emit.  Moreover, the Incentive Program requires Formosa to strive to reduce this amount even further to 550 ppm.  A failure to reach this number, that is even further below than what the law requires, will result in stipulated penalties under the Consent Decree.

The Incentive Program will be applied as follows: At the end of three years, Formosa will inform the governments of the lowest annual limit to which it is willing to commit.  The limit to which Formosa commits will be made enforceable under the Consent Decree until such time as Formosa modifies its CAA Title V permit to make the emissions limit enforceable through Formosa's Title V permit.  Additionally, to provide Formosa an incentive to agree to the lowest

- 17 -

feasible limit, the Decree will impose stipulated incentive penalties on a schedule. If Formosa reaches and commits to the goal of 550 ppm, Formosa will not be required to pay any stipulated penalty. If Formosa does not reach the 550 ppm goal, but achieves a limit somewhere between 550 ppm and 750 ppm, the Consent Decree provides a tiered stipulated penalty which graduates the stipulated penalty relative to 550 ppm goal, *i.e.*, the better Formosa's performance in reducing its emission limit towards the 550 ppm goal, the lower the stipulated penalty Formosa will be obligated to pay. The total potential exposure for Formosa, assuming the poorest performance under the Incentive Program, is a one time stipulated penalty of up to $300,000.

### E. Monetary Penalty

The Consent Decree requires Formosa to pay a civil penalty of $450,000. Fifty percent of the penalty amount will go to the State of Delaware. As set forth above, this penalty amount reflects mitigation based upon Formosa's agreement to perform the SEP described above.

## III.    DEVELOPMENTS SINCE THE DECREE WAS LODGED

### A. The Public Comment Process

In accordance with 28 C.F.R. § 50.7 and Paragraph 125 of the Consent Decree, on July 7, 2005, the United States Department of Justice published a notice of lodging of the Decree in the *Federal Register*. 70 Fed. Reg. 39335 (July 7, 2005) (attached hereto as Exhibit A). The notice described the principal terms of the settlement and provided the public an opportunity to comment on the Decree.

The United States received one comment, via electronic mail from an individual, B.

Sachau, of Florham Park, New Jersey[2] (attached hereto as Exhibit B).  In the comment, B.

Sachau asserted that the payment of $225,000 to Delaware is insufficient for violations of the

CAA, CWA, RCRA , CERCLA and EPCRA.  B. Sachau further asserted that the appropriate

penalty amount should be $1,000,000.

### B.  Preliminary Implementation of the Consent Decree

Formosa completed, and EPA and DNREC have reviewed all of the statutory and

regulatory requirements of the Consent Decree.  This work can be found at Appendices B, C, D,

L and M of the Consent Decree.

## IV.    ARGUMENT

The United States has reviewed the single comment received and respectfully requests

that the Court enter the Consent Decree.  The concern articulated in the single comment does not

change the United States' conclusion that the Decree is fair, reasonable, and consistent with the

public interest.  Accordingly, it is respectfully submitted that the Decree should be entered.

### A.  Standard of Review

The approval of a consent decree is within the discretion of the district court.  *United*

*States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1035 (D. Mass. 1989), *aff'd* 899 F.2d 79 (1st

Cir. 1990);  *United States v. Hooker Chem. and Plastics Corp.*, 776 F.2d 410, 411 (2d Cir. 1985).

A court must review the proposed consent judgment to determine whether it represents a

resolution that is fair, reasonable, and consistent with the public interest. *See United States v.*

*Jones & Laughlin Steel Corp.*, 804 F.2d 348, 351 (6th Cir. 1986) (Clean Water Act).  The

---

[2]        According to Mapquest, Florham Park, New Jersey is in northern New Jersey and
is 137 miles from Delaware City, Delaware.

consent decree must also further the objectives of the applicable statutes. *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409,1424 (6th Cir. 1991).

Voluntary settlement of legal disputes is favored by the courts and is generally perceived to be in the public interest. *See Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983). There is a strong presumption that the agencies are acting in the public's interest in favor of settlement when the Justice Department negotiates a deal on behalf of the EPA in the environmental field, which requires special expertise. *Akzo Coatings*, 949 F.2d at 1426.

Moreover, the Court should defer to the environmental expertise of the agencies charged with enforcing the environmental statutes and protecting the environment. *See United States v. SEPTA*, 235 F.3d 817, 822 (3d Cir. 2000) (Approval of a Consent Decree in CERCLA litigation should be informed by the deference owed to "EPA's expertise and to the law's policy of encouraging settlement...."). *See also United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (The policy of the law to encourage settlements "has particular force where...a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement."). When reviewing a proposed Consent Decree, a Court should balance its discretion with appropriate deference toward "(t)he efforts of the EPA and the Justice Department, experts in the field of environmental recovery, and their determination that the proposed Consent Decree is in the public interest...." *United States v. Nat'l R.R. Passenger Corp.*, No. CIV. A. 86-1094, 1099 WL 199659, at *7 (E.D. Pa. April 6, 1999), *aff'd SEPTA*, 235 F.3d 817 (3d Cir. 2000). In determining whether a consent judgment is fair, reasonable, and adequate to protect the public interest, the court must not rubberstamp the agreement, but also must not substitute its own judgment for that of the parties to the decree. *Id.* at 1435 (citations

omitted); *accord In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003).

For the reasons set out below, the consent decree between the United States, the State of Delaware, and Formosa advances the objectives of the applicable statutes. Accordingly, it should be entered.

**B.  The Consent Decree is Fair, Reasonable, and Consistent with the Public Interest**

The Consent Decree is the product of intense negotiations between the parties over several months. Legal and technical expertise was present at each negotiation session. As set forth above, the United States Department of Justice (both locally and in Washington, DC), EPA, and the State of Delaware, provided attorneys and technical expertise forming a large team to deal with the many multimedia issues raised by this case. The parties worked not only to resolve the governments' allegations, but also to identify opportunities to reduce vinyl chloride emissions from the Formosa facility. The Consent Decree reflects this effort. The Consent Decree contains provisions returning Formosa to statutory and regulatory compliance, as well as measures to ensure consistent compliance into the future. Moreover, the Decree contains measures that go beyond legal compliance, obtaining Formosa's agreement to reduce vinyl chloride emissions below what the law requires. By this agreement, the Formosa facility's environmental fitness is greatly improved. In addition, the primary pollutant of concern of this action, vinyl chloride, has been reduced or is more stringently controlled than required by law in each of the areas of alleged violation: the CAA, CWA, RCRA, CERCLA, and EPCRA.

It is therefore the United State's conclusion that the Consent Decree is consistent with and furthers the objectives of the CAA, CWA, RCRA, CERCLA, and EPCRA because it: 1) corrects the alleged violations; 2) creates systems to assure continued compliance with

- 21 -

environmental law; and, 3) reduces vinyl chloride emissions by 18 tons in the first year, and up to

an additional 10 tons per year within the next three years. Accordingly, the United States

respectfully requests that, because the Consent Decree is fair, reasonable and consistent with the

public interest, the Court should enter it.

**C.    The Public Comment Does Not Serve as a Basis to Withhold Entry of the Consent Decree**

As set forth above, the United States received a single comment to the published notice of

the Decree. At the outset, it is important to note that the writer incorrectly asserts that the penalty

in this case is "$225,000" when, in fact, Formosa will pay a cash penalty of $450,000, with

$225,000 paid to each the United States and the State of Delaware. The writer asserts that

Formosa should pay a penalty of $1,000,000. Although the writer does not explain why he/she

believes the amount is too low in relation to the specific claims at issue, it is important to note

that the value of the SEP ($842,847), a project Formosa will undertake in mitigation of the cash

penalty, together with the cash penalty ($450,000), totals $1,292,847 and, thus, actually exceeds

the writer's asserted appropriate penalty.

Most demonstrative of the adequacy of the penalty in this matter is the fact that the

economic benefit EPA estimates Formosa enjoyed as a result of the violations alleged in the

complaint is approximately $100,000. The cash penalty captures four times the economic

benefit, and the total penalty amount (including SEP) recaptures Formosa's economic benefit

over twelve fold. Accordingly, the amount of penalty in this case, especially when considered in

conjunction with the SEP, is adequate to punish Formosa for past violations and to deter it from

committing future violations.

Moreover, the very brief, conclusory comment does not reflect any understanding by the writer of the Formosa facility, vinyl chloride, the complexities of the case, or details of the Consent Decree itself. As many courts have noted, "[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms . . . . Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). Although the writer focused on the cash penalty alone, in fact, more valuable then the cash penalty are the emissions reductions of a toxic chemical, vinyl chloride. These reductions could not have been obtained in this case through litigation even with total victory by the government and the most severe application of existing law. The Consent Decree also contains provisions designed to ensure consistent compliance with environmental law and regulation well into the future, not only as a requirement of ths Consent Decree, but when the Consent Decree is terminated (see the Memorandum of Understanding at Appendix P), as a requirement of Formosa's CAA Title V permit, (*see e.g.,* Consent Decree at ¶ 15).

Consequently, when all of these provisions are viewed together, there can be no doubt that the Consent Decree serves the public interest. Of note, no environmental or community groups have opposed the entry of this Consent Decree or submitted comments concerning it. Further, the Federal and State agencies charged with protecting the environment (EPA & DNREC) advocate in favor of entry of this Decree. Accordingly, the absence of any persuasive opposition to the Consent Decree, and the environmental agencies' advocacy in favor of it, argues strongly in favor of entry of the Consent decree by this Court.

## V.    **CONCLUSION**

In sum, the single comment received fails to provide any reason why this Court should

not enter the Consent Decree upon finding that it is fair, reasonable and consistent with the

public interest.  Pursuant to Paragraph 125 of the Consent Decree, Formosa has already agreed to

its entry of the Decree.  Additionally, the State of Delaware also seeks entry of the Decree.

Accordingly, for the reasons set forth above, the United States respectfully requests that the

Court enter this Consent Decree by signing it on page 50.

Dated:  _8/31/05_

Respectfully submitted,

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

_C. Connolly (4/RC)_
COLM F. CONNOLLY
United States Attorney
District of Delaware

RUDOLPH CONTRERAS
Assistant United States Attorney
District of Delaware
Nemours Building
P.O. Box 2041
Wilmington, DE   19899-2046
(302) 573- 6277

- 24 -

# EXHIBIT A

## DEPARTMENT OF JUSTICE

**Notice of Lodging of Consent Decree Pursuant to the Clean Air Act, the Clean Water Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right To Know Act, and the Comprehensive Environmental Response, Compensation and Liability Act**

Notice is hereby given that a consent decree in *United States and the State of Delaware* v. *Formosa Plastics Corporation, Delaware,* Civil Action No. 05–443 (D. Del.) was lodged with the court on June 28, 2005.

The proposed consent decree resolves alleged violations of the Clean Air Act, the Clean Water Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right to Know Act and the Comprehensive Environmental Response, Compensation and Liability Act that occurred at Formosa's Delaware City, Delaware PVC manufacturing facility. It requires the defendant to pay a civil penalty of $225,000 to the United States and $225,000 to the State; to meet detailed requirements designed to prevent future violations of each of the above statutes; to reduce emissions of vinyl chloride to the ambient Air to levels substantially below those otherwise allowed by law; and to carry out a supplemental environmental project that will protect against the chance of an accidental release of vinyl chloride gas.

The Department of Justice will receive, for a period of thirty (30) days from the date of this publication, comments relating to the proposed consent decree. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, PO Box 7611, U.S. Department of Justice, Washington, DC 2004, and should refer to *United States and the State of Delaware* v. *Formosa Plastics Corporation, Delaware,* Civil Action No. 05–443 (D. Del.), DOJ Ref. # 90–5–2–1–08297.

The proposed consent decree may be examined and copied at the Office of the United States Attorney, 1007 North Orange Street, Suite 700, Wilmington, DE 19899–2046; or at the Region III Office of the Environmental Protection Agency, c/o Joyce Howell, Senior Assistant Regional Counsel, 1650 Arch Street, Philadelphia, PA 19103. During the public comment period, the amended consent decree may also be examined on the following Department of Justice Web site, *http:// www.usdoj.gov/enrd/open.html.* A copy

of the amended decree may also be obtained by mail from the Consent Decree Library, P.O. Box 7611, U.S. Department of Justice, Washington, DC 20044–7611 or by faxing or e-mailing a request to Tonia Fleetwood (*tonia.fleetwood@usdoj.gov*), fax No. (202) 514–0097, phone confirmation number (202) 514–1547. In requesting a copy from the Consent Decree Library, please enclose a check in the amount of $13.75 (25 cents per page reproduction cost) payable to the U.S. Treasury.

**Robert Brook,**

*Assistant Chief, Environmental Enforcement Section, Environment and Natural Resources Division.*

[FR Doc. 05–13388 Filed 7–6–05; 8:45 am]

**BILLING CODE 4410–15–M**

## DEPARTMENT OF JUSTICE

**Notice of Lodging of Consent Decree Under the Comprehensive Environmental Response, Compensation and Liability Act**

Under 28 CFR 50.7 notice is hereby given that on June 27, 2005, a proposed Consent Decree in *United States* v. *Metal Masters Foodservice Equipment Company, Inc.,* Civil Action No. 05–430 was lodged with the United States District Court for the District of Delaware.

In this action the United States sought reimbursement of response costs incurred in connection with property known as the Tyler Site located at 655 Glenwood Avenue in Smyrna, Delaware. The Consent Decree provides that the defendant pay $100,000 to the EPA Hazardous Substance Superfund to resolve its liability in connection with its releases of hazardous substances at the Tyler Site.

The Department of Justice will receive for a period of thirty (30) days from the date of this publication comments relating to the Consent Decree. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, PO Box 7611, U.S. Department of Justice, Washington, DC 20044–7611, and should refer to *United States* v. *Metal Masters Foodservice Equipment Company, Inc.,* D.J. Ref. 90–11–3– 06700.

The Consent Decree may be examined at the Office of the United States Attorney, District of Delaware, 1007 Orange Street, Suite 700, Wilmington, Delaware 19801, and at U.S. EPA Region III, 1650 Arch Street, Philadelphia, Pennsylvania 19103. During the public comment period, the Consent Decree may also be examined on the following

Department of Justice Web site, *http:// www.usdoj.gov/enrd/open.html.* A copy of the Consent Decree may also be obtained by mail from the Consent Decree Library, PO Box 7611, U.S. Department of Justice, Washington, DC 20044–7611 or by faxing or e-mailing a request to Tonia Fleetwood (*tonia.fleetwood@usdoj.gov*), fax no. (202) 514–0097, phone confirmation number (202) 514–1547. In requesting a copy from the Consent Decree Library, please enclose a check in the amount of $68.50 (25 cents per page reproduction cost) payable to the U.S. Treasury. In requesting a copy exclusive of exhibits, please enclose a check in the amount of $5.75 (25 cents per page reproduction cost) payable to the U.S. Treasury.

**Robert Brook,**

*Assistant Chief, Environmental Enforcement Section, Environment and Natural Resources Division.*

[FR Doc. 05–13387 Filed 7–6–05; 8:45 am]

**BILLING CODE 4410–15–M**

## DEPARTMENT OF JUSTICE

**Notice of Lodging of Consent Decree Pursuant to the Clean Air Act**

Notice is hereby given that on June 16, 2005, a proposed consent decree in *United States* v. *Morton Int'l, Inc.,* Civil Action No. 05–3088 (DMC), was lodged with the United States District Court for the District of New Jersey.

The proposed consent decree will settle the United States' claims for failure to comply with the general duty clause of the Clean Air Act, 42 U.S.C. 7412(r)(l), on behalf of the Environmental Protection Agency ("EPA") against Morton International, Inc. ("Morton"), relating to its violations of regulations applicable at its former facility in Patterson, New Jersey, which occurred through April 1998. Pursuant to the proposed consent decree, Morton will pay $50,000.00 as a civil penalty and complete a Supplemental Environmental Project ("SEP") of up to $200,000.00 by supplying Passaic County Department of Health with equipment that is useful in identifying potentially dangerous circumstances and in responding thereto. Should the SEP cost less than $200,000, the difference between that amount and the actual cost of SEP will be paid as an additional civil penalty.

The Department of Justice will receive for a period of thirty (30) days from the date of this publication accept comments relating to the proposed consent decree. Comments should be addressed to the Assistant Attorney General of the Environmental and

# EXHIBIT B

publicc comment on federal rgister of 7705 vol 70 no 129 pg 39335.txt
From: jeanpublic@yahoo.com
Sent: Saturday, July 09, 2005 12:12 PM
To: Fleetwood, Tonia (ENRD)
Cc: rodney.frelinghuysen@mail.house.gov
Subject: publicc comment on federal rgister of 7/7/05 vol 70 no 129 pg 39335

usdoj consent decree - us v formosa plastic - action 05 443

this company violated the clean air act, clean water act, rsource conservation act, community right to know act, cercla act in delaware pvc facility.

and you propose to let this company walk away from those violations by paying an el cheapo $225,000 to delaware.

the rights of all american citizens were violated. i propose that the penalty alone be $1, 000,000.00.

i think the costs should be calculated with an eye as to what one sick child takes to try to hang on to life.

this is far to sweetheart a deal for this company. is anybody paying off?

b. sachau
15 elm street
florham park nj 07932

---

Do You Yahoo!?
Tired of spam?  Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of August 2005, I electronically filed the attached **THE UNITED STATES' MOTION TO ENTER CONSENT DECREE and MEMORANDUM IN SUPPORT THEREOF** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

ROBERT W. WHETZEL
Richards, Layton & Finger, PA
P.O. Box 551
Wilmington, DE  19899

KEVIN P. MALONEY
Deputy Attorney General
Delaware Department of Justice
Carvel State Office Building
820 North French Street
Wilmington, DE 19801

RUDOLPH CONTRERAS
Chief, Civil Division
Assistant United States Attorney
1007 Orange Street
Suite 700
Post Office Box 2046
Wilmington, Delaware 19899-2046
(302) 573-6277